

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ JUL 1 7 2005 ★

BROOKLYN OFFICE

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Victor Monroe, | ) |
|         Petitioner-Appellant, | ) |
| v. | ) |
| | ) |
| Robert H. Kuhlman, | ) |
| Superintendent, | ) |
| Sullivan Correctional Facility, | ) |
|         Respondent-Appellee. | ) |

No. 01-0654 (JBW)

MEMORANDUM,
ORDER AND
JUDGMENT

APPEARANCES:

For the Petitioner-Appellant:      LARRY SHEEHAN, ESQ.
840-11 Grand Concourse
Bronx, New York 10451

For the Respondent-Appellee:      Office of the District Attorney
Kings County
By: THOMAS ROSS
Assistant District Attorney
350 Jay Street
Brooklyn, New York 11201-2908

JACK B. WEINSTEIN, Senior United States District Judge:

## Table of Contents

I. Introduction .................................................................................................................2

II. Facts..........................................................................................................................3

    A. Procedure at Trial............................................................................................3

    B. Documents Sent to Jury....................................................................................6

III. Procedural History Challenging Conviction.............................................................7



A. State Courts..................................................................................................................8

B. Federal Courts..............................................................................................................9

IV. Law of Habeas Corpus....................................................................................................9

A. Remand........................................................................................................................9

B. Second Circuit Summary..............................................................................................9

C. Case Not Affected by Standard...................................................................................10

V. Law on Jury Practice.......................................................................................................11

A. History of the Jury......................................................................................................11

B. Modern Reform Generally..........................................................................................12

C. New York Reforms.....................................................................................................14

D. Lack of Constitutional Barriers to Reform................................................................16

E. Supreme Court Guidance............................................................................................17

F. Specific New York Practice........................................................................................18

VI. Application of Law to Facts...........................................................................................19

VII. Future Consultation Among Attorneys and Court.......................................................20

VIII. Conclusion..................................................................................................................21

## I.   Introduction

Petitioner seeks a writ of habeas corpus.  He claims that his constitutional rights were violated when the state trial judge allowed the jury to read documents admitted in evidence in the jury room, without counsel or court present, before the case had been submitted for deliberation. The petition is dismissed because (1) by not objecting despite full awareness, defense counsel

consented to the practice; and (2) this technique is a commendable example of new procedures that are increasing the effectiveness of the modern jury.

## II.    Facts

### A.    Procedure at Trial

Petitioner was tried in the Supreme Court of the State of New York before a judge and jury. On strong evidence, he was convicted of murder. In May 1994 he was sentenced to a prison term of twenty-five years to life.

On several occasions during the course of the trial, the presiding judge ordered that exhibits that had already been formally admitted be brought to the jury room for examination by jurors while the court was in recess. The viewings occurred during breaks between trial sessions. On one occasion the judge instructed the jurors to come to court on a Friday when court was not in session.

The trial judge began this practice on the first full day of trial, giving the following instruction to the jury:

> We're going to recess before the cross-examination, give you a break. During the break I'm going to have the physical exhibits that have been received in evidence shown to you so that you may see them; the photos and the ballistics evidence, and have the court officer display it for you on your table in the jury room. You are not permitted to have any discussion about these items. The photos you could just take and pass around, as well as there's a sketch, and look at them and pass them to the next juror and then we'll collect them when you have seen it. Again, don't discuss the case during the break. We'll resume in a few moments.

Tr. at 95. No objection was taken. Counsel and defendant were present.

The next day the judge again instructed the jurors to examine evidence in the jury room during a brief afternoon recess:

> We'll take a break for a few moments. During the break I am going to have the photograph that was just marked by this [witness] passed around among you. There were also some photographs received in evidence yesterday which I will have passed around amongst you. Don't discuss anything about it. We'll resume in a few moments.

Tr. at 347-48. No objection was taken. Counsel and defendant were present.

After the break, the judge said, "Even if you didn't get a chance to see all the exhibits, we're going to give you the opportunity on the next break. I want to move this along." Tr. at 352. No objection was taken. Counsel and defendant were present.

Later that day, the judge once again informed the jurors about his plan for giving them additional opportunities to see the evidence:

> All right. We're going to recess the trial because I have a substantial amount of other business to do, so I'm going to give you a longer lunch break again while I complete my other business. Those of you that didn't get a chance to see those exhibits, you'll have a chance now, and we'll resume at 2:15, and I've arranged for the rain to stop so you can enjoy the weather a little bit more to make up for yesterday. Don't discuss the case. Return at 2:15. Have a nice lunch.

Tr. at 400-01. No objection was taken. Counsel and defendant were present.

Finally, at the end of the day, the judge instructed the jury to come to the courthouse the following day, Friday, for the sole purpose of examining evidence:

> Tomorrow, because of my other business, we will not be working on this trial. But what I am going to do, I am going to arrange to have the exhibit that you just heard about that's now in evidence available for you to look at and read. Come in in the morning. Dress casually, if you like. You will not be coming into the courtroom. The exhibit will be made available to you in the jury room. After you have had a chance to read it, you will be excused for the rest of the day.

Tr. at 458. No objection was taken. Counsel and defendant were present.

Trial resumed the following Monday. Once again, the judge instructed the jurors

to examine evidence in the jury room during their break:

> We are going to recess the trial for your lunch. Before you go out, I'm going to
> have the two photographs that were received in evidence that you haven't seen
> close up, that is Defense Exhibit F, and the photos of the line-up. You will see
> them in the jury room, again, no discussion permitted about them. We're going to
> resume the trial at 3:00 p.m.

Tr. at 579-80. No objection was taken. Counsel and defendant were present.

The following day, the judge summarized for the jury how the remainder of the trial

would proceed.

> I am going to tell you now that we will complete any testimony tomorrow, that's
> the plan, any further testimony that the defense wishes to offer, if any, we will
> complete tomorrow, hopefully, and then I'm going to arrange for Friday for you to
> come in to look at any of the physical exhibits again that you may not have seen,
> and on Monday you will get the case for your deliberations.

Tr. at 756-57. No objection was taken. Counsel and defendant were present.

The next afternoon, a Thursday, after the trial judge had dismissed the jury for a

brief recess, counsel for the defendant objected to the planned Friday viewing.

> THE COURT: Now, before we adjourn, I had proposed and I told the jury that I
> would bring them in tomorrow to review all the exhibits in the case. You have an
> objection to that.
> MR. GIAVONIELLO: Judge, *I know the Court indicated that last Friday* and I
> know the Court said on the record that it was going to happen on Friday. *To tell
> you the truth, I didn't hear it. And I would have objected last Friday and I object
> to it happening now, because the defendant will not be in Court.*
> THE COURT: You understand that all the exhibits have been shown to the Jurors
> in the Jury room without them coming into the Courtroom. So, they don't know
> that your client is not here.
> MR. GIAVONIELLO: I don't know that and I object to that happening.
> THE COURT: The only reason I'm doing that is for the convenience of the jurors.
> MR. GIAVONELLO: I understand that, Judge.

Supp. Tr. at 3. (Emphasis supplied.)

In response to this objection—counsel's first—the trial judge immediately cancelled the

viewing planned for the following day, and discontinued the practice for the remaining two days

of the trial.


**B.    Documents Sent to Jury**

The following items were admitted into evidence:

PEOPLE'S EXHIBITS

| Number | Item |
| --- | --- |
| 1. | Diagram of crime scene by Detective Donohue |
| 2. | Enlargement of number 1 |
| 5. | Envelope containing five spent shells and two deformed copper jacketings of bullets |
| 6. | Officer Meyer's gun and the voucher form for it |
| 7. | Bullet from Officer Meyer's body |
| 8. | 12 autopsy photographs |
| 9. | Willie Jones's medical records |
| 10. | 2 photographs of the lineup |
| 11. | 3 photographs of JoAnn Monroe's jeep |
| 12. | Officer Meyers's timesheet |

DEFENSE EXHIBITS

| Letter | Item |
| --- | --- |
| A-E | 5 photographs of the crime scene taken by the People |
| F | Photograph of defendant's brother |
| G | Audiotape of Willie Jones's statement to an Assistant District Attorney |

*See* Letter from Thomas M. Ross, Assistant District Attorney, June 27, 2006.

Exhibit number 12 was not viewed by the jury in the jury room because it was admitted

into evidence after the trial court stopped the practice. All other exhibits were made available for

viewing in the jury room. Exhibit number 2 cannot be found. It was simply an enlargement of

Exhibit number 1, which was otherwise identical in appearance. Exhibit numbers 5 and 6 are in

the custody of the Property Clerk of the Police Department. They can be obtained by subpoena or by the officer who vouchered the property thirteen years ago if that officer is still with the police, but neither side thought them important enough to subpoena for the habeas case. Exhibit number 7 cannot be located. It could still be with the Property Clerk, but the voucher form is missing from the file of the District Attorney; consequently, the number under which it is kept with the Property Clerk cannot be determined. Those exhibits, including the gun, could have made no difference in the jury's verdict.

The court has examined the relevant available exhibits; the attorneys in the habeas case were given the same opportunity. It is clear beyond a reasonable doubt that it made no difference in the verdict that the exhibits were examined in the jury room rather than in open court. There was nothing unusual about them. Passing them from hand-to-hand between jurors for individual examination in open court would have taken time better spent on other matters by the court and counsel, in the absence of the jury. Their evaluation by the jury would have been exactly the same wherever the jurors examined them.

Given the facilities available in this court and other federal courts, the documents would have been projected onto a large screen so all could read them at once. Alternatively, they would have been duplicated so each juror would have his or her own copy to read in open court or in the jury room. The state trial judge accomplished the same result with the more rudimentary facilities available to him, at no loss in fairness to the defendant.

## III. Procedural History Challenging Conviction

Petitioner asserts in this habeas corpus proceeding that allowing the jury to examine the

evidence in the jury room prior to deliberation deprived him of his right to trial by jury, guaranteed by the Sixth Amendment and Clause 3, Section 2, Article III of the United States Constitution. He argues that the absence of direct judicial supervision of any element of a jury trial constitutes reversible error of such magnitude that his constitutional rights were violated.

## A.    State Courts

The Appellate Division affirmed petitioner's conviction. It found that petitioner "did not initially object to, and in effect acquiesced in the procedure followed by the court." *New York v. Monroe*, 234 A.D.2d 320, 320, 651 N.Y.S.2d 536, 537 (2d Dept. 1996). It held that petitioner's "belated claim that he was prejudiced" by the trial court's actions was "purely speculative," and that "[t]here is no indication in the record that [petitioner's] ability to defend against the charges was in any way affected by the court's action." *Id.*

The New York Court of Appeals granted leave to appeal. *New York v. Monroe*, 90 N.Y.2d 982, 688 N.E.2d 491 (N.Y. 1997). Over a single judge's dissent, the highest New York Court concluded that the trial judge's absence from the jury's viewings did not affect "the organization of the court or the mode of proceedings [required] by law," and therefore could not be reviewed on appeal absent a timely objection in the trial court. *Id.* at 983-84. The Court noted that the jury examined the exhibits only after they had been received in evidence, and that the trial judge had warned the jury not to discuss the evidence or the case, "which was sufficient to dispel the possibility of premature deliberation during the viewings." *Id.* It held that "the viewings did not require any rulings or instructions and did not implicate any of the Judge's substantive roles in conducting the trial." *Id.*

8

**B.      Federal Courts**

In February 2001, petitioner filed a pro se habeas petition. *See* 28 U.S.C. § 2254. This court denied the petition on the ground that petitioner's claim was not preserved and, therefore, judicial review in a habeas corpus proceeding was barred. *Monroe v. Kuhlman*, 2003 U.S. Dist. LEXIS 22441, No. 01-CV-0654 (E.D.N.Y. Oct. 28, 2003). It rejected as without merit any other possible constitutional claim.

On appeal, the United States Court of Appeals for the Second Circuit vacated this decision. It held that a procedural barrier such as faulty claim preservation was an inadequate reason to preclude federal review of a claim, if an actual deprivation of rights might exist. *See Monroe v. Kuhlman*, 433 F.3d 236 (2d Cir. 2006). It remanded the case.

**VI.      Law of Habeas Corpus**

**A.      Remand**

The remand was for evaluation by this court of petitioner's judicial supervision claim, "to address the merits of the claim." *See Monroe v. Kuhlman*, 433 F.3d 236, 245 (2d Cir. 2006). The appellate court also ordered this court to determine "whether, because the intermediate [state] appellate court reached the merits of Monroe's judicial supervision claim, federal courts review the intermediate appellate court's decision using AEDPA deference, or whether, in light of the state supreme court's erroneous holding as to a procedural bar, we consider Monroe's claim *de novo*." *Id.*

**B.      Second Circuit Summary**

The United States Court of Appeals for the Second Circuit has recently summarized the law regarding petitions for habeas corpus as follows:

> Where . . . a petitioner seeks a writ of habeas corpus, Congress has specified that a reviewing court shall not grant relief "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). . . .
>
> We employ a standard of "objective reasonableness" when reviewing a state court's interpretation of federal law, which includes our evaluation of whether a state court unreasonably refused to extend a governing legal principle to a new context where it should apply. *See Kennaugh v. Miller*, 289 F.3d 36, 45-46 & n.2 (2d Cir. 2002). Mindful of the Supreme Court's guidance that "an unreasonable application of federal law is different from an incorrect application of federal law," *Williams*, 529 U.S. at 410, we have held that "[s]ome increment of incorrectness beyond error is required" before habeas relief will be permitted, *see, e.g., Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000). At the same time, however, we cautioned that "the increment need not be great" because "otherwise, habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" *Id.* (quoting *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 889 (3d Cir. 1999) (en banc)).
>
> We underscore that "the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States[,]' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

*Ernst J. v. Stone*, 2006 U.S. App. LEXIS 15585, *21-23 (2d Cir. June 21, 2006).

## C.    Case Not Affected by Standard

In the instant case, the facts and law are so clear that it is not necessary to decide what standard of review or degree of deference applies. Under any rule of review, based on the law of habeas corpus, no unconstitutional denial of petitioner's rights occurred.

## V.    Law on Jury Practice

## A.    History of the Jury

The right to a trial by jury traces back at least to Magna Carta, predating by centuries the existence of professional advocates trained in the law, the convention of sworn witness testimony, or official procedures for admitting evidence. In early British criminal process, juries were selected from among local responsible people and asked to independently investigate events constituting possible crimes, reporting their findings to the court in the dual role of witness and fact-finder. *See, e.g.,* 2 Fredrick Pollock & Frederic William Maitland, *The History of English Law* 622 (2d ed.1898). The jury's main role was "to get information useful to the Crown from those people most likely to have it." Theodore Plucknett, *A Concise History of the Common Law* 119-20 (2d ed. 1936). Over time, the in-court portion of the trial gained in importance as the legal profession strengthened, the adversary system evolved, and procedures were developed permitting lawyers and judges to control the jury's receipt of evidence. *See, e.g.,* 1 William Holdsworth, *A History of English Law* 337-347 (7th ed. 1956); Julius Goebel Jr., *Cases and Materials on the Development of Legal Institutions* 75-79 (1946).

The American colonies inherited England's devotion to the right to, and procedures for, trial by jury. They employed juries in civil and criminal trials. Leonard W. Levy, *The Palladium of Justice: Origins of Trial by Jury* 69 (1999). At the time of the adoption of the Bill of Rights, juries still retained much unrestrained power over fact and law. *See, e.g., Blakely v. Washington,* 542 U.S. 296, 306, 124 S. Ct. 2531, 2539 (2004); *United States v. Khan,* 325 F. Supp. 2d 218, 226 (E.D.N.Y. 2004); Larry Kramer, *People Themselves: Popular Constitutionalism and Judicial Review* 28 (2004); John H. Langbein, *The Origins of Adversary Criminal Trial* 57 (2003).

11

## B.    Modern Reform Generally

Over time, practices designed to control the jury became entrenched in the adversarial system. Today, even some useful innovations not prohibited by the Constitution or rules of evidence or procedure are often met with mistrust by some members of the legal profession. Judge Mark A. Frankel, writing on the subject of improving jury trials, suggests that "the reluctance to expand the powers of totally passive and unenlightened juries stems from three sources: (1) the tremendous inertia of long-standing legal tradition; (2) a basic distrust of juries; and (3) trial attorneys' and judges' fear of loss of control of the trial process." Mark A. Frankel, "Legal Institutions: A Trial Judge's Perspective on Providing Tools for Rational Jury Decision-making," 85 Nw. U.L. Rev. 221, 222 (1990).

Increasingly, judges and scholars are expressing concern that the traditional conceptualization of jurors as "passive observers and recorders of information who suspend judgment on the evidence and issues until they retire for deliberation," threatens not only to "denigrate the jury as a democratic institution," but results in unsatisfying juror experiences, undermining public confidence in the jury system—"the place where citizens most often come face-to-face with the courts." Vicki L. Smith, "How Jurors Make Decisions: The Value of Trial Innovations," in National Center for State Courts, *Jury Trial Innovations* 14–15 (1997). *See also, e.g.,* Judge B. Michael Dann, "'Learning Lessons' and 'Speaking Rights': Creating Educated and Democratic Juries," 68 Ind. L.J. 1229 (1993); Chief Judge of the New York Court of Appeals, Judith Kaye, quoted in "Jury Summit 2001," 86 Judicature 145 (2003).

If we are to preserve the right to effective trial by jury, unhindered by ill-founded notions of juror inadequacy, the legal system must make effective use of jurors. The rigid structure of a

courtroom environment, foreign to most jurors, can cause stress and frustration that can lead to reduced comprehension of difficult materials. Sunwolf, "Juror Stress: New Challenges to Juror Competency," The Champion, June 2006, at 10-15.

In civil trials it is not uncommon in this and other federal courts for jurors to be asked to take large amounts of documentary evidence home over the weekend or during court recesses, in the expectation that with more time and in a less stressful environment, they will be able to make more effective use of the evidence they are asked to evaluate. Judges do this constantly, taking home documents in preparation for the next day's hearings; they are not demonstrably wiser than our jurors. Jurors must not be insulted by having their time wasted with inefficient and unnecessary procedural formalities.

Today's jurors are not the largely illiterate plebians of the old English system that spawned our jury system. Ninety-seven percent of Americans today are literate; 84 percent have a high school degree or higher; almost half have been to college; and 27 percent have a bachelor's degree or higher. *See* U.S. Census Bureau, American Factfinder, *available at* http://factfinder.census.gov (2004). In New York State, jury source lists have been expanded so that lawyers, pharmacists, police officers—and even judges—are called to jury duty.

Modern juries in this and other federal courts may take notes, are given special juror notebooks containing key evidence, and can ask questions through the court. *Cf., Verizon Directories Corp. v. Yellow Book USA, Inc.*, 331 F. Supp. 2d 136, 143 (E.D.N.Y. 2004) (discussing the use of technology to facilitate jury trials).

Not only can our jurors be relied upon to conduct sophisticated analyses of complex information, they tend to become understandably frustrated if their ability to do so is needlessly

impaired or marginalized. *Cf.* M. Saks, Small-Group Decision Making and Complex Information Tasks (Federal Judicial Center 1981) (in a large percentage of criminal cases, the jury's verdict matches what the judge would have found had it been a bench trial); Harry Kalven Jr. & Hans Zeisel, *The American Jury* 152 (1966) (high proportion of agreement between judges and jurors).

Recent innovations in jury trial management have reflected a clear trend toward liberalizing the restrictions traditionally imposed on active juror participation. "Judges, lawyers, law teachers, social scientists, jurors themselves, and others have called for an end to the traditional passive role of the juror and urged the utilization of several techniques intended to create more juror participation in trials." Dann, *supra at* 1229-1230.

Arizona has been in the forefront of reform. In the early 1990s, it instituted a comprehensive jury-trial-reform program geared toward providing jurors with a more active voice in trial proceedings and improving jury comprehension. *See* Arizona Supreme Court Committee on More Effective Use of Juries, "Jurors: The Power of 12," *available at* http://www.supreme.state.az.us/jury/Jury/jury1g1.htm. In 2005, the American Bar Association adopted its own set of suggestions for reform of the jury process, largely mimicking Arizona's ideas. *See* American Bar Association, "Principles for Juries and Jury Trials," *available at* www.abanet.org/juryprojectstandards/principles.pdf.


C.     **New York Reforms**

Here in New York, the Chief Judge of the Court of Appeals, Judith Kaye, created the New York Jury Trial Project in 2003, gathering fifty-one judges from sixteen counties to

14

experiment with jury trial innovations. She declared, "We want jurors to experience a court system that works well, respects [jurors'] time and their lives, and values their performance in this most vital civic duty." *Quoted in* "Jury Summit 2001," 86 Judicature 145 (2003). Directly citing the Chief Judge's admonishment that "we cannot, and should not, ignore the lessons learned with respect to the best manner in which to assist the jury in performing its function," and the "enormous amount of research and innovation nationwide focused on jury improvement," a unanimous panel of the New York Appellate Division, Second Department, recently overturned years of precedent prohibiting trial judges from instructing the jury on the elements of a crime prior to closing arguments. *See New York v. Harper*, 2006 N.Y. Slip Op 4442 (N.Y. App. Div. June 6, 2006). Even before the initiative of New York's Chief Judge, official endorsement of innovations, such as using juror trial notebooks and allowing jurors to submit questions for witnesses, had largely been codified. *See* N.Y. Comp. Codes R. & Regs. tit. 22, § 220 *et seq.* (2005).

While none of the New York reforms specifically address the issue of jurors' access to evidence prior to deliberations, there is a developing body of literature that advocates allowing jurors to discuss evidence on an ongoing basis prior to deliberation. According to Judge B. Michael Dann, "Neither state nor federal case law precludes modifying present practice to allow jurors to discuss the evidence before deliberation," and "a verdict will not be disturbed where predeliberation juror discussions have been proven, absent a showing that the jurors involved decided the merits prematurely or that prejudicial outside information was introduced into the decision-making process." Dann, *supra at* 1266.

The same concern with first-hand examination of evidence before deliberation applies to

15

early discussion of evidence—*viz.*, concern that the jurors will make up their minds on the merits before the judge and parties have fully presented the case. Jurors must be assumed to be capable of following instructions not to do this. If they are told not to deliberate on the merits or engage in discussions when examining evidence, we may rightly believe that they will not do so.


**D.     Lack of Constitutional Barriers to Reform**

In *United States v. Grant*, the United States Court of Appeals for the Second Circuit approved the concept that procedures may change to improve the system. It declared that

> [i]f courts are to discharge their responsibilities to society by accomplishing their work, they must not bind themselves by fetishistic rules that immobilize the judge, disabling him or her from performing useful judicial work, unless this is justified. . . . Although courts have been slow to accept change, such changes of tradition have unquestionably improved the trial process. We should not assume that all practices that depart from tradition are ipso facto erroneous.

*United States v. Grant*, 52 F.3d 448, 449 (2d Cir. 1995).

The Sixth Amendment right to a trial by jury does not mean the right to a trial operating according to the exact procedures utilized when the Bill of Rights was ratified. Justice Brandeis identified the need for innovation in jury trial procedure as early as 1920 when he wrote, "New devices may be used to adapt the ancient institution to present needs and to make of it an efficient instrument in the administration of justice. Indeed, such changes are essential to the preservation of the right." *Ex parte Peterson*, 253 U.S. 300, 309-12, 40 S. Ct. 543 (1920). *See also Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 178 F. Supp. 2d 198, 256-58 (E.D.N.Y. 2001) (allowing for the admissibility of statistical and sampling evidence as proof of injury in a mass tort case), *rev'd on other grounds*, 344 F.3d 211 (2d Cir. 2003).

The Federal Rules of Evidence grant federal courts discretion to exercise "reasonable control" over "the mode and order" of evidence presentation, "so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, [and] (2) avoid needless consumption of time. . . ." Fed. R. Evid. 611(a). This rule has not been successfully challenged on constitutional grounds. It would be strange to declare a state practice unconstitutional when it is widely and properly utilized in federal courts.

When the trial judge in the instant case chose to implement a somewhat unconventional procedure in allowing jurors to individually closely examine the evidence in the jury room—including lengthy medical records of one of the victims—he was not only acting in accordance with his discretionary power to make the presentation of evidence more effective and efficient, but also participating in what has proven to be a widespread shift toward liberalization of the jury trial process, not only in New York State, but nationwide. He should be commended, not vilified by a charge of denying a constitutional right.

### E.     Supreme Court Guidance

While the Supreme Court has interpreted the constitutional right to a "trial by jury" to provide "that the trial should be in the presence and under the superintendence of a judge having power to instruct them as to the law and advise them in respect of the facts," *Patton v. United States*, 281 U.S. 276, 288 (1930), the Court has given no guidance on the issue now posed. It has not spoken on what constitutes such a deprivation of that right by minor procedural tune-ups of process as to warrant granting a writ of habeas corpus—or even declaring reversible error on direct appeal from a federal prosecution. The Court has construed the right of a "trial by jury," in

17

federal court, to mean "(1) that the jury should consist of twelve [people], neither more nor less; (2) that the trial should be in the presence and under the superintendence of a judge having power to instruct them as to the law and advise them in respect of the facts; and (3) that the verdict should be unanimous," *Patton*, 281 U.S. at 288. The parameters defining the second criterion—what it means to be "in the presence and under the superintendence of a judge"—has never been clearly defined. It is in this ambiguity that petitioner bases his petition. The Supreme Court not having spoken clearly on the issue, it is not a proper basis for granting the petition. *See* Part IV.B, *supra*.

## F.    Specific New York Practice

New York State law delegates to the trial judge the ultimate responsibility for determining the use and contents of juror notebooks—in which jurors may be given exhibits received into evidence—and deciding which exhibits the jurors may take into the jury room during deliberation. *See* N.Y. Comp. Codes R. & Regs. tit. 22, § 220.12 (2005) (juror notebooks); N.Y. Criminal Procedure Law § 310.20 (Consol. 2006) (jurors' use of exhibits during deliberations). It follows that the trial judge also retains some discretion over the mode and order of presentation of evidence to the jurors. It is true that section 260.30 of the New York Criminal Procedure Law provides for the standard order in a jury trial, in which jurors are given full access to admitted evidence at the last stage, deliberation. N.Y. Criminal Procedure Law § 260.30 (Consol. 2006). Nevertheless, it is well established that "[t]he statutory framework [delineated in CPL § 260.30] is not a rigid one, and the common-law power of the trial court to alter [it] 'in its discretion and in furtherance of justice' remains at least up to the time the case is

submitted to the jury." *New York v. Olsen*, 34 N.Y.2d 349, 353 (N.Y. 1974). *See also New York v. Washington*, 71 N.Y.2d 916, 918 (N.Y. 1988); *New York v. Benham*, 160 N.Y. 402, 437 (N.Y. 1899). Note also the favorable interpretation of the procedure used in the present case by the Appellate Division and New York Court of Appeals. *See* Part III.A, *supra*.


## VI.    Application of Law to Facts

Petitioner argues that neither he nor his counsel knew of the practice in question, though the trial judge announced it at least five times in open court. Both petitioner and his attorney were present all five times.

The court now finds, after full reflection (and contrary to the oral preliminary finding during the evidentiary hearing) that defense counsel was not credible when he says he was not aware that this procedure was being followed. He had been practicing criminal law for forty years at the time of the trial. It is not believable that an attorney of such experience would be totally unaware of what the judge was repeatedly instructing the jury in his presence. *See* Tr. of Evidentiary Hearing, May 24, 2004, at 24; Part II.A, *supra*.

After close examination of the trial transcript and in view of the trial lawyer's limited recollection of the trial, the court finds that counsel's assertions of ignorance are not credible. He was in all respects alert and effective in his advocacy on behalf of the petitioner. He only objected to the practice now challenged when it occurred to him that having the jury possibly find out that petitioner was absent from court on Fridays might create prejudice. As the Appellate Division found on direct appeal, the trial judge correctly construed petitioner's silence as consent. *See New York v. Monroe*, 234 A.D.2d at 320, Part III.A, *supra*. When petitioner

19

finally did object, the trial judge promptly stopped the practice.

The trial judge is to be praised for his interest in utilizing the jury fully, and in not wasting his time—and that of counsel—which could be used more effectively doing "useful judicial work." There was no point in the judge sitting as a figurehead, an admired silent jewel or potted plant, serving no purpose other than to formally sanctify a hoary procedure while the jurors individually plodded through documents in open court.


## VII.    Future Consultation Among Attorneys and Court

While there is no formal restriction against individual trial judges implementing procedural improvements in jury trials under their supervision, they should be mindful of the fact that many in the judicial system tend to be opposed to change until its beneficial effect on the trial process is fully proved. To ensure a smooth transition from the old to the new, trial judges should solicit the active participation of the attorneys trying the case before them, requesting advice, outlining ahead of time any innovative procedures they intend to use and obtaining explicit consent from all counsel. The entire legal community must cooperate, applying its skills to ensure that our system of justice functions as effectively as possible.

There are, of course, dangers when a defendant or his counsel is absent from a significant trial event. The conclusion in *Snyder v. Massachusetts*, 291 U.S. 97, 54 S. Ct. 330 (1934), that the defendant need not be present when the jury views a crime scene is now discredited. *See, e.g.,* John H. Mansfield, Norman Abrams, Margaret A. Berger, et al., *Evidence*, 136-39 (9th ed. 1997) (views). Here there was no danger to due process posed by the jurors' quiet reading of documents in evidence under an instruction to do no more with them than would be done in open

20

court.

## VII.    Conclusion

The petition is dismissed.  A certificate of appealability is granted on the issues remanded

by the Court of Appeals for the Second Circuit.  Whatever the burden of proof, or presumption,

or deference applied, the result would be the same: there was no violation of defendant's

constitutional rights.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated:  June 28, 2006
        Brooklyn, NY